# United States District Court
### for the
### Western District of New York

United States of America

v.

THEODORE LORIA

*Defendant*

Case No. 19-MJ-679

## CRIMINAL COMPLAINT

I, NICHOLAS MAZZOLA, FBI, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning in or about December 2016 continuing through the present, in the County of Monroe, in the Western District of New York, the defendant violated 18 U.S.C. §§ 2261A(1)(B), 2261A(2)(B), offenses described as follows:

the defendant, with the intent to kill, injure, harass, intimidate or place under surveillance with the intent to kill, injure, harass or intimidate, engaged in conduct and used an interactive computer service or electronic communication system of interstate commerce to engage in a course of conduct that caused or attempted to cause substantial emotional distress to another person, in violation of Title 18, U.S.C. §§ 2261A(1)(B), 2261A(2)(B).

**SEE ATTACHED AFFIDAVIT OF NICHOLAS MAZZOLA, T.F.O., FBI.**

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

*Complainant's signature*

NICHOLAS MAZZOLA, T.F.O., FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 10, 2019

*Judge's signature*

HONORABLE JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State: Rochester, New York

# **AFFIDAVIT**

STATE OF NEW YORK   )
COUNTY OF MONROE  )    SS:
CITY OF ROCHESTER  )

I, Nicholas Mazzola, being duly sworn, depose and state the following:

1. I am a police investigator employed by the Rochester Police Department and am currently assigned as a Task Force Officer on the FBI Cyber Squad, Buffalo Division, in Rochester, NY. I have been a police officer since 1994, an investigator since 2003, and was assigned to the Major Crimes Unit from January, 2011 to December, 2018. I have attended numerous courses in criminal investigations, and have had the opportunity to conduct, coordinate and or participate in a number of successful investigations involving burglaries, robberies, weapons possession, assaults, larcenies, cyber and economic crimes, child pornography/ exploitation, and homicides, and have interviewed hundreds of defendants, Victims, witnesses and others who have been involved in such offenses.

2. I make this affidavit in support of a criminal complaint charging THEODORE LORIA, with violation of Title 18, United States Code, Sections 2261A(1)(B), 2261A(2)(B)(Cyber Stalking).

3. All information contained in this affidavit is either personally known by me or has been related to me by other law enforcement agents. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that THEODORE LORIA did knowingly violate Title 18, United States Code, Sections 2261A(1)(B), 2261A(2)(B) (Cyber Stalking).

## BACKGROUND OF INVESTIGATION

4.     On or about June 26, 2018 the Buffalo FBI Cyber Task Force was notified of a possible cyber stalking campaign being executed by Theodore LORIA of Irondequoit, NY. The FBI interviewed the Victim on June 27, 2018, she provided a verbal statement and documentation of the stalking campaign from the previous years.

5.     The Victim stated she met LORIA in May 2015 at the Victim's place of employment. Shortly after the meeting, LORIA expressed an interest in dating, which was not reciprocated by the Victim. In or about September 2015, LORIA contacted the Victim and told her that they needed to talk as her life was in danger. In a subsequent conversation, LORIA told the Victim that he had overheard, while in a steakhouse, the Victim's ex-boyfriend and father of the Victim's daughter, say that the Victim was better off dead and that the ex-boyfriend was going to kill her (the Victim). LORIA then offered to keep an eye on the ex-boyfriend and the Victim to ensure her safety.

6.     On October 31, 2015, LORIA told the Victim that he had seen a mysterious car circling her property and that he chased it away. He also told the Victim that Halloween is an easy night to commit murder because it was the one night when wearing a mask was not questioned. LORIA told the Victim he would stay on her driveway through the night to ensure her safety. The Victim could not confirm if LORIA did stay the entire evening as the full length of the driveway is not visible from residence.

7.     LORIA and the Victim became romantically involved for approximately three months in late spring to early summer 2016. During that time, LORIA became protective of the Victim and jealous of any male clients or employees. LORIA would

2

routinely monitor the Facebook page of the Victim and would comment to her about online conversations she had with males on the Facebook page. In the summer of 2016, the Victim began to distance herself from LORIA. In June 2016, LORIA requested to meet the Victim at a local Dunkin Donuts. In that meeting LORIA presented the Victim with a diamond ring and said that he wanted people to know that the Victim was spoken for. The Victim refused to take the ring at which point LORIA stated "take the fucking ring" and "put the god damn ring on your fucking finger." The Victim kept the ring and departed the location. She was followed by LORIA to a new location where he apologized. The Victim stated she did not speak with LORIA for several months after.

8. Months later the Victim saw LORIA in her driveway as she was walking her daughter to the bus stop. LORIA told the Victim, "give me my fucking ring back." The Victim gave the ring back to LORIA only to have it returned outside her door at a later date. On December 30, 2016, the Victim received a text message from phone number 585-280-XXXX that stated, "Your DEAD cop calling bitch [address of Victim]". The Victim provided a screenshot of this text message to the FBI. This phone number was not known to the Victim as she had known LORIA's personal cellular phone to be 585-739-XXXX. The Victim believed this text message, and others to be included in this affidavit, were sent from LORIA as she had known him to often misuse 'your' vs. 'you're' and would capitalize words within a text for emphasis.

9. The Victim told the FBI that she also received threats from LORIA both in phone calls and through text messages (from his known personal phone). The Victim recalled one phone call where LORIA stated he would burn her place of business down with all the

3

animals inside it. LORIA also told the Victim that he had connections to the mafia and to cold blooded killers who owed him favors, and who would take care of people who crossed him. The Victim told the FBI that she deleted all the texts from LORIA's personal number – she stated she did this at a time when she wanted him out of her life.

10.     In February 2017, the Victim had dinner with her daughter, her daughter's father (Victim's ex-boyfriend), and another individual. After dinner, LORIA approached her ex-boyfriend in the parking lot. LORIA told him that he would beat him every day for the rest of his life and that if he went to jail that he would beat him again after he got out. When the Victim attempted to intervene and LORIA said "you fucking hugged him when got out of the car" referencing a greeting that had taking place approximately an hour and a half earlier.

11.     Following the dinner incident the Victim began receiving escalating threats via phone call, text message, or in person at her place of business. LORIA told the Victim that she had crossed him and he had no choice but to teach her a lesson. LORIA also claimed that he would ruin her reputation as a business owner and drain her financially. The Victim subsequently warned her employees not to let LORIA on the property.

12.     In June 2017, the Victim went to a local YMCA for the first time. Upon leaving the facility and walking to the parking lot, she noticed that a vehicle was parked extremely close to her driver side door. When the Victim got closer she noticed LORIA in the vehicle blocking her access to her vehicle.

13.     On multiple occasions, LORIA would sit at the end of the Victim's driveway at approximately 8:00 AM – 8:15 AM; this is the same time the Victim would walk her

4

daughter to the school bus. LORIA would routinely be in a black convertible with the top down. The Victim stated this behavior started in 2015, would occur about two times a month, and was last observed in June 2018.

14. On or about September 3, 2017, the Victim received a text message from the phone number 585-250-XXXX. The message stated that it was sent from LORIA's nephew 'Angel'. The Victim confirmed LORIA did have a nephew by this name but that she did not know him. The message referenced the dinner incident and that the Irondequoit Police Department had gotten involved, which was accurate. The text further stated that LORIA was falsely arrested and was facing jail time, which was "NOT GOOD".

15. On or about September 22, 2017, the Victim received a text message from phone number 786-535-XXXX. The message stated "So you and Charlie Tan planned to kill our boss and family member for the money he had left you …. your dead dog lady". Prior to this text message LORIA had claimed that he had a $1,000,000 life insurance policy which named the Victim as the beneficiary. The Victim also confirmed that she had allowed Charlie Tan to volunteer at her place of business while he was undergoing legal events. The Victim explained she interpreted the message to appear to come from someone in the mafia working for LORIA (the boss). The Victim believed this was another text actually sent from LORIA.

16. On or about May 6, 2019, the Victim forward an email that she had previously received from LORIA on November 21, 2017. LORIA used the email address teddyloria@yahoo.com. The full content of the email addressed multiple issues that LORIA felt had occurred over the course of the relationship with the Victim. LORIA used a writing style of capitalizing key words throughout the email, similar to the writing style in the

5

harassing text messages. Also included in the email were two references to Charlie Tan. Those included: "...@ Christmas time just because I refused to attend Christmas eve dinner with Charlie Tan, who "admitted" killing his own father, and was invited well after me...", and "...It has come to my attention that you asked Charlie Tan to kill me so you could receive the one million dollar insurance policy which I took out on your behalf in June 2016".

17. On December 24, 2017, the Victim received a phone call from 716-783-XXXX; when she answered she could hear someone breathing then the caller hung up. The Victim then received a text message from the same number that stated "You know who it is. If you want to talk call me back." Approximately 15 minutes later, the Victim received another text message that stated, "Merry Christmas Don't ever think your safe because you betrayed the wrong person this time Im [sic] going to kill you and your daughter will be going to live with her father". The Victim called 911 and the Wayne County Sheriff's Department responded. Upon recommendation from the responding officer, the Victim made a call to the 716-783-XXXX and the phone went straight to voicemail. The Victim then called LORIA on his personal phone, that being 585-739-XXXX; the Victim asked LORIA if he had just called and LORIA denied it. LORIA then asked the Victim, "are you sitting in the back of a police car?" The Victim was at the time.

18. On March 18, 2018 the Victim received a text message from phone number 585-353-XXXX. The text message stated it had been sent from the Irondequoit Police Department ("... we Irondequoit Police Officers...") and referenced the incident on December 24, 2017. The message included the name of the responding officer from the Wayne County Sheriff's Office. The message ended with "We are all now your ENEMY and

6

we are a national fraternity of brotherhood which know where ALL your family members live [Victim mother's address] [Victim sister's address]". The Victim confirmed the addresses of her family members were correct.

19.     On May 28, 2018, the Victim received a text message from phone number 585-820-XXXX, and in text the sender claimed to be Dave Ferrari. Ferrari stated he was a former Monroe County Sheriff's Deputy and was now a process server. The message stated he wanted to make an appointment to discuss contents of a demand letter. The text further explains that Ferrari had been hired to serve the letter and that it includes very personal information regarding (the Victim) and her businesses which might be disclosed in two separate lawsuits. The Victim did not respond to the text message. On June 6, 2018, a male claiming to be Ferrari showed up at her place of business and delivered paper documentation titled "Lawsuit #1" and "Lawsuit #2". Based upon my training and experience, the documents do not appear to have been drafted by any reputable legal professional. The documents contain multiple sections in bold font that appear to be direct quotes extracted from conversations or text messages with the Victim. Lawsuit #1 begins "Facts which will be disclosed to the general public (on the internet) in the lawsuit regarding surveillance and research from 7-27-15…". Lawsuit #2 begins "Facts which will be disclosed to the general public (on the internet) in the lawsuit regarding non-payment of services rendered for security work to protect both dog kennels which are very UNSAFE for customers pets due to [Victim name] LONG list of enemies.!!!".

20.

7

Search Warrant Findings

21. On July 9, 2018, the FBI obtained a Search Warrant authorizing the search of cellular phone numbers 585-250-XXX, 585-353-XXXX, 716-783-XXXX, 786-535-XXXX, 585-739-XXXX, 585-820-XXXX, and 585-280-XXXX, to include the search of subscriber information, toll records, historical tower data, and precision GPS data.

22. The Verizon results for phone number 585-739-XXXX identified the subscriber as Lisa Yeager, address in Rochester, NY. Billing details identified six phone numbers under this account, and phone number 585-739-XXXX known to be used by LORIA. The IMEI number associated with the LORIA 585-739-XXXX number was 359177070857220. Your Affiant knows the IMEI number to be the International Mobile Equipment Identity number which is a unique to the device.

23. The Verizon results for phone number 585-820-XXXX identified the subscriber as a pre-paid phone through TracFone. One of the five latitude and longitude data coordinates included in the Verizon results was 43.23681, -77.69135. Open source search of those coordinates through Google Maps identified a location within Stoney Creek Apartments, near the intersection of English Road and Long Pond Road in Rochester, NY. New York state registration information identified David Ferrari with an address of 813 Stowell Drive, #A-5, Rochester, NY 14616; your Affiant knows this address to be at the same Stoney Brook Apartment complex.

December 2018 Incidents

24. The Victim contacted the FBI on December 22, 2018, and stated that she received a disturbing text message earlier that same day. The text message was sent from

8

phone number 585-351-XXXX, to the personal cellular phone of the Victim. The message included the following:

> We know everything about you and your family
>
> We know what you look like
>
> We know where you live
>
> We know you drive a black Lexus SUV
>
> We know the back of your house faces a dark cornfield
>
> We know everything about your daughter [Victim daughter's first name, hereinafter 'VDFN']
>
> We know what your daughter VDFN looks like
>
> We know your daughter VDFN's bedroom window faces the woods and dark cornfield
>
> We know what school your daughter VDFN goes too [sic]
>
> We know what time your daughter VDFN leaves for school in the morning
>
> We know what school bus your daughter VDFN takes to school
>
> We know what time your daughter VDFN gets out of school to go home
>
> We know what time your daughter VDFN gets home from school

25.     A review of an FBI internal database identified that carrier for phone number 585-351-XXXX was T-Mobile. A preservation request was sent via email to T-Mobile on December 26, 2018 and confirmed via phone on December 27, 2018.

26.     While speaking with the FBI on December 22, 2018 the Victim communicated two additional incidents. After sunset on Sunday, December 16, 2018, the Victim noticed two flashlights in the field outside her residence. The Victim went outside and yelled in the direction of the flashlights to get off her property. Only after getting her dog and

9

yelling that she was going to release the dog did the flashlights go away. The Victim stated that she was unable to see or hear anyone and that only after receiving the text message on the 22nd did she think it may be related.

27.	The Victim also stated that she received a phone call from LORIA on November 25, 2018. In that phone call LORIA told her that he knew she was trying to have him killed. LORIA called the Victim from phone number 585-261-XXXX. Upon hearing his voice the Victim immediately hung up the phone. She attempted to dial the number back later but no one answered. A review of an FBI internal database identified the carrier of phone number 585-261-XXXX as Verizon.

28.	On Christmas morning, December 25, 2018, the Victim communicated to the FBI that a white male knocked on her door at 7:45 AM. The individual told the Victim he was a process server and instructed her to open her door. The Victim did not open the door and walked away from the front door area. The Victim went to a nearby window and took two pictures with her cellular phone. The images show a white male driving a dark black or blue Hyundai sedan. The white male in the photo, based upon your Affiant's comparison, closely resembles the DMV photo of David Ferrari.

29.	On January 3, 2019, the FBI interviewed employees of the Vision Hyundai Henrietta car dealership including the President of the Vision Auto Group. During this interview, both Vision employees stated that LORIA, who is employed at the dealership as overnight security, was one of the individuals that would have had access to a Hyundai dealer vehicle and dealer license plates. The only other individuals with access to the vehicles would have been sales team supervisors. During the interview the Vision employees confirmed that

10

no vehicles were out on test drives during the time period of December 23, 2018 through December 25, 2018. They also stated that for the first time in the history of the organization, they were closed for three consecutive days, December 23, 2018 through December 25, 2018 further indicating that no dealer cars should have been on the road. The employees stated that it would have been a clear violation of policy to take a dealer vehicle from the dealership without permission and give that car to another person.

30.     A preservation request was sent via fax to Verizon on December 26, 2018 and was confirmed via phone on December 27, 2018 for phone numbers 585-739-XXXX, 585-820-XXXX, 585-261-XXXX.

31.     On January 3, 2019, the FBI obtained a Search Warrant authorizing the search of cellular phone numbers 585-739-XXXX, 585-820-XXXX, 585-261-XXXX with Verizon and 585-351-XXXX with T-Mobile. The Search Warrant authorized the search of subscriber information, toll records, historical tower data, and precision GPS data for all referenced phone numbers.

32.     Subscriber results for 585-351-XXXX showed a pre-paid phone activated on December 22, 2018 with no subscriber name listed.

<u>February 3, 2019 Physical Surveillance</u>

33.     The Victim contacted the FBI on February 3, 2019 through a series of emails. Those emails stated that the Victim was driving to her mother's house to pick up her daughter when she identified LORIA following her. The Victim estimated that LORIA followed her for approximately three miles until she reached a populated area and pulled over to let him pass. The Victim sent multiple emails to the FBI with a variety of video and image files. In

11

those files, a dark black or blue Hyundai sport utility vehicle is shown with a white male driver. The Victim told the FBI that she was confident it was LORIA.

<u>February 9, 2019 Life Threatening Text Message</u>

34.      FBI Special Agent (SA) Kevin Parker received a phone call from the Victim on the morning of February 9, 2019. During that call the Victim described a text message she had received to a work cellular phone at her place of business. The text message was sent at approximately 11 PM eastern on February 8, 2019, but was not read until the morning of February 9, 2019. The message stated the following, "Make sure when you get in your black SUV # ASD-[actual license plate of Victim] it doesn't explode from a bomb or make sure when you stop at a traffic light someone doesn't pull up next to you and blow your Rat face off with a shotgun [new line] Hope your windows are bulletproof because someone might sniper you out or throw a bomb through them tapped to a brick [new line] You and Charlie Tan tried to kill the wrong person".



Figure 1: Image taken by the FBI of the Victim's Phone

35.   The Victim told the FBI that February 9th was her daughter's birthday and that LORIA has a history of escalating his behaviors on holidays or special dates.

### Interview of David Ferrari

36.   On May 6, 2019 David Ferrari was interviewed at his residence, by FBI SA Kevin Parker and your affiant. In sum and substance, Ferrari said he serves legal process as

13

part of his employment. He also works part-time for Vision Hyundai but does not get paid by them, rather he is paid by LORIA. Ferrari was shown images taken from the Victim's place of employment. Ferrari confirmed the images included photos of him serving legal process to the Victim for LORIA. Ferrari went on to say LORIA had a relationship with the Victim. Ferrari believed LORIA, however, was not able to get over the fact that the relationship ended. LORIA told him that he was going to initiate a $1,000,000 life insurance policy with the Victim as the beneficiary. LORIA became obsessed with the idea that the Victim was going to have LORIA killed by Charlie Tan. LORIA told Ferrari about an incident on Christmas Eve 2015 or 2016 when he (LORIA) was invited to the Victim's for Christmas Eve dinner. LORIA later learned Charlie Tan would also be there and believed Charlie Tan would kill him if he went.

37. Also during the May 6, 2019 interview, Ferrari stated LORIA had said he did security work for the Victim, for which he had not been paid. Ferrari believed the legal papers he had served to the Victim had to do with unpaid security work performed by LORIA. SA Parker and your affiant were told by Ferrari to interview LORIA for details and went on to say LORIA saves everything. When asked where LORIA saves his information, Ferrari said he believed he saved it on his phone. Ferrari provided his phone number as 585-820-XXXX. When asked for LORIA's phone number, he said he would rather not give it and declined.

38. Following the interview of Ferrari, SA Parker and your affiant spoke with the Victim via telephone. She was informed SA Parker and your Affiant had just interviewed Ferrari and was asked if she could answer a few follow up questions. When asked about her knowledge of an insurance policy, the Victim recalled LORIA telling her about a policy where

14

she was the beneficiary. She recalled LORIA showing her an image on his cell phone, which he claimed was proof he had taken out an insurance policy. The Victim was never able to confirm a policy existed. When asked about Charlie Tan, the Victim said a mutual friend asked if Tan could volunteer at her business. The Victim was reluctant at first because she didn't know how her clients would feel. The Victim eventually allowed Tan to volunteer. He would come in every Thursday to walk the dogs. Regarding the holiday dinner, the Victim said her mother had invited LORIA for Christmas dinner. Prior to the dinner, the Victim had learned Tan did not have a place to go for Christmas, so she invited Tan for dinner. LORIA learned Tan had been invited and was clearly upset by Tan's invitation.

39. On August 18, 2019, your affiant was contacted by Victim. Victim said she was driving her vehicle with her daughter in the passenger seat when a black Mercedes SUV drove up behind her at a high rate of speed. The vehicle pulled up directly to her rear bumper in an alarming manner and then passed Victim at a high rate of speed. Victim continued travelling in the same direction. Victim saw the same Mercedes SUV waiting off to the side of the road. The SUV was parked in the gravel/ dirt facing the road. As Victim passed the vehicle, she slowed to see who was driving the vehicle and observed LORIA alone in the driver's seat. Victim took several pictures of same. Considering previous incidents and contacts with LORIA, Victim and her daughter were extremely alarmed and concerned for their physical safety.

40. On August 26, 2019, LORIA filed a civil complaint at Wayne County Supreme against the Victim and Charlie Tan. The complaint alleged that, " Defendants [Victim] and Charles Tan devised a scheme to have me killed in order for [Victim] to receive

15

the life insurance money of one million dollars which she was the sole beneficiary". It should be noted the allegations of having LORIA killed are also made in the text sent to [Victim] on February 8, 2019 from burner phone number 585-503-XXXX.

WHEREFORE, based on the foregoing, I respectfully submit that there is probable cause to believe that Theodore LORIA did knowingly violate Title 18, United States Code, Sections 2261A(1)(B), 2261A(2)(B) (Cyber Stalking).

_____
NICHOLAS MAZZOLA
FBI Task Force Officer

Sworn to before me this 10th

___ day of September, 2019.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge