IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

-vs-

THEODORE LORIA,

Defendant.
_____


**STATEMENT OF SENTENCING FACTORS**


Indictment No. 20-cr-06074-EAW




Respectfully submitted,

Mark A. Foti, Esq.
Attorney for Defendant, Theodore Loria
The Foti Law Firm, P.C.
16 West Main Street, Suite 100
Rochester, New York 14614
Phone: (716) 812-4803
E-mail: mark@fotilaw.com

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 3

SENTENCING FACTORS ........................................................................................... 3

   Characteristics and History of Theodore Loria................................................... 4

   The Nature and Circumstances of the Offense .................................................. 8

   Purpose of Sentencing....................................................................................... 11

CONCLUSION ........................................................................................................... 14

PRELIMINARY STATEMENT

The plea agreement entered into by the parties indicates that "it is the agreement of the parties pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure that the Court at the time of sentence impose a sentence of imprisonment 24 months." *See* Plea Agreement, Dkt no. 27 at 4-5. The Court has deferred acceptance of the plea agreement until sentencing. Under the circumstances of this case, the imposition of a 24-month sentence would be sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a)(2).

Unresolved objections were filed separately. *See* Dkt. # 35.

SENTENCING FACTORS

The sentencing guidelines provide ranges of sentences based on a combination of factors used to calculate an offense level and criminal history category. The sentencing guidelines are merely advisory, and only one factor among many that the Court may consider in determining a reasonable sentence. *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) Following *Booker,* the Court is responsible for considering the guidelines, but "also determining ultimately what a reasonable sentence should be under Section 3553(a)." *United State v. Singletary*, 458 F.3d 72, 75 (2d Cir. 2006).

Pursuant to 18 U.S.C. § 3553(a), the Court must consider factors including the history and characteristics of the defendant; the nature and circumstances of the offense; and the purpose of sentencing including retribution, deterrence, incapacitation, and rehabilitation; and the need to avoid sentencing disparity.

### Characteristics and History of Theodore Loria

Mr. Loria, often referred to as "Teddy," was born in December 1966. When he was four years old, he lost his father, Eugene Loria to a heart attack. He was raised by his mother, Anette Loria, and his older sister, Lisa Yeager. Annette Loria worked at Xerox and then Kodak to support her children.

Today, Mr. Loria is 53-years-old. For much of his life, he suffered from mental health issues including Bipolar Disorder that went undiagnosed and untreated. As noted in the Objections to the PSR, prior to this offense, the defendant's "most recent [criminal conviction] was over 20 years ago for a violation-level offense." *Objections to PSR*, Dkt. # 35 at 4. Prior to that point, there had been a substantial amount of arrests, and even though many of them were for minor offenses or infractions (e.g. "Speeding (Infraction)" is one of the convictions; *see PSR*, Dkt. # 36 at ¶ 99), the behavior was certainly problematic.

In 1999, Mr. Loria was diagnoses with Bipolar Disorder during a five-month commitment to Rochester Psychiatric Center. That marked what may have been the first step in the right direction, but the road ahead would not be without setbacks.

In December 2000, Mr. Loria accepted a plea to a drug offense that he had committed over two years earlier in 1998. He served time and was released to parole, where he struggled with technical violations and was repeatedly returned to custody. Although, the violations would result in re-incarceration, his conduct did not result in new criminal charges.

Then, while he was incarcerated in 2007, his mother passed away at age 72. *See PSR*, Dkt. # 36 at ¶ 136. Those who knew Mr. Loria during his mother's lifetime, knew how close they were. I share office space with an attorney, David Murante, who knew Mr. Loria during his

younger years and has talked about the close relationship he had with his mother. The loss of his mother had an enormous impact on Mr. Loria.

As documented in the PSR: "Loria described his Bipolar disorder as highly manic until his mother passed away in 2007, and then it shifted to being more depressive." *PSR*, Dkt. # 36 at ¶ 138. Mr. Loria "attempted to commit suicide by hanging himself while in the New York State Department of Corrections in 2007" before having his life saved by the guards. *Id.*

To this day, Mr. Loria has never fully recovered from the guilt he has felt for being incarcerated at the time of his mother's passing. During the Pretrial Services interview, Mr. Loria became emotional when he recalled being incarcerated during the passing of his mother.

It would seem that the impact of his mother's passing did indeed affect his behavior moving forward. The day after Mr. Loria was released for the last time in September 2008, he went to work.

He obsessively poured himself into his work, working long days, often seven days per week. He ended up adopting his dog, Blue, not long after this, and Blue was always at the center of his life. When Mr. Loria worked at Vision Hyundai seven days per week, Blue worked alongside him, every day. Blue grew up to be a very large, affectionate dog. Blue was lovingly referred to by some of the employees as the company's unofficial mascot.

With his mother gone, Mr. Loria's only family was his sister, Lisa, and Blue.

Mr. Loria made a critical mistake. He stopped taking medication for his bipolar disorder and he did not seek mental health treatment. He thought he could self-medicate by pouring himself into non-stop work. His life revolved around his work at Vision Hyundai and his dog Blue. While that may have been a deterrence to criminal conduct for a significant period of time, without proper mental health treatment, it did not last.

It was because of Blue, that Mr. Loria first had contact with the victim, through her dog training business. That relationship started professionally, but quickly became a unique friendship and then evolved into an intimate relationship. While the criminal complaint painted a picture of a very short relationship, the truth is that the relationship went on for significantly longer than the victim told the Government and was far more serious than she had originally insinuated.

The offense will be discussed further, below, but for purposes of the defendant's history, at this point, it is important to note that Mr. Loria and the victim were not just physically intimate, but they were emotionally intimate, and Mr. Loria was introduced to and had a father-type relationship with the victim's daughter. In text messages between Mr. Loria and the victim, the word "family" was often used to describe themselves. Introducing Mr. Loria to her daughter and talking about family was obviously a large emotional weight for Mr. Loria, who other than his sister and Blue, had no family left.

Not taking medication, and now emotionally invested in a family-like relationship always had the potential for disaster, though Mr. Loria could not see it at that time. He took out a life insurance policy with the victim as the beneficiary. He later started to become convinced that some of her more bizarre behavior, including her anger over Mr. Loria not wanting to meet her friend, Charlie Tan[1], had nefarious intent. As time passed, and as the relationship ended, he became convinced that she had conspired with Tan to kill him for the benefit of the insurance policy.

---

[1] Charlie Tan is an individual who was charged and prosecuted for the high-profile murder of his father in Monroe County NY. *See* https://www.democratandchronicle.com/story/news/2015/09/30/charles-tan-case-timeline-when-his-father-killed/73101706/.

And while there are portions of the complaint that are untrue, Mr. Loria admits and accepts responsibility for his behavior, as stated in the factual basis. He is responsible for threatening text messages and other harassing behavior that led to his arrest on September 17, 2019. He has admitted that he is ashamed of his behavior, and his frustration with himself is compounded by his guilt over being separated from his dog, Blue.

Unfortunately, Blue is 11-years-old. He has a growth and there have been concerns, particularly by Mr. Loria, that Blue could have cancer. Mr. Loria has consistently been overwhelmed with grief over having been separated from Blue and concerns over his health. He has repeatedly said "I let my dog down… like I let my mother down."

The separation from Blue has been more punishing than any other aspect of incarceration. During the plea negotiations, Mr. Loria has requested that he be permitted to see Blue before his sentencing. The Government did attempt to communicate with the Marshals to see if such a visit could be arranged, but ultimately, we were informed that was a "no go." At this point, Mr. Loria been separated from Blue for over a year. It has been extraordinarily painful.

This has contributed to Mr. Loria's remorse and has played a roll in his efforts to get mental health treatment in the jail and in his agreement to resolve the matter early, even knowing that there were significant portions of the allegations that could be proven false by the cellular extractions in the possession of the Government.

Mr. Loria is taking medication as prescribed, including Depakote nightly. Going forward, Mr. Loria has committed to mental health treatment. While he hopes to be able to return to work, he has come to terms with the fact that no amount of work can forego his need for continuous treatment, including prescribed medication.

His sister, Lisa, has remained supportive of her brother and supports his ongoing treatment. She lovingly describes him as "a person who will go above and beyond helping his friends, family and is a very simple, dedicated, loving and caring person," but she recognizes the need for mental health treatment, and she has indicated a willingness to support him upon release in addition to the support and oversight that he will receive from the U.S. Probation Office. She demonstrated her commitment throughout this case, not just in her communication with my office, but she has been at nearly every court appearance, taking time off of work to be present, whenever possible.

### The Nature and Circumstances of the Offense

Mr. Loria's conduct was unlawful and wrong. He understands that, especially now, having benefited from the perspective obtained through treatment and prescribed medication for his Bipolar Disorder.

It is important, however, to note that the criminal conduct of Mr. Loria is largely described in the factual basis, and that prior compilation of allegations, specifically the complaint and search warrant applications throughout this investigation, contained inaccurate pieces of information.

The PSR relies heavily on information obtained early in the investigation, including material that was incorporated into the criminal complaint, especially in paragraphs 17 – 54. The criminal complaint was based on information conveyed by the victim and/or her attorney, Sharon Stiller, to the FBI. The victim had claimed that she had "deleted all the texts from [Mr. Loria's] personal number." *PSR*, Dkt. # 36 at ¶ 22. With no text messages to demonstrate the history of

the relationship between the victim and Mr. Loria, she was able to make verbal representations regarding their relationship that were relied on by the Government in sworn statements in the Complaint. For example, she claimed that the relationship lasted approximately three months, ending in early summer 2016. *See Complaint*, Dkt. # 1 at 3. She insinuated that everything following the summer of 2016 was a period of time when Mr. Loria stalked her.

Following the arrest of Mr. Loria, his cell phone was seized by the Government and a cellular extraction was conducted. The result of that extraction established that despite what was conveyed to the FBI, the relationship between the victim and Mr. Loria did not end after three months in the early summer of 2016. The relationship continued until approximately May of 2017, almost a year longer than she had described.

The victim had continued to recognized Mr. Loria as her boyfriend for a long period of time after the point when she had claimed the relationship had ended in early summer 2016. They had arguments at times, but they were clearly still together. For example, in October 2016, the victim sent Mr. Loria multiple angry text messages about old pictures of him with other women on Facebook and they threatened each other with ending the relationship, but the relationship persisted. The victim invited Mr. Loria to Christmas with her family, and she was *infuriated* when he backed out because she had also invited Charlie Tan, an individual that Mr. Loria did not trust.

The victim had omitted that she invited Mr. Loria to Christmas in 2016 when she first spoke to investigators. They learned of the situation from a third party. It appears that, based on discoverable materials, when law enforcement found out about this, they asked the victim whether it was true; she admitted that Mr. Loria had been invited, but downplayed it as an invitation from her mother. The text messages, however, later showed that that the victim was

indeed responsible for his invite and was furious when he backed out of what was supposed to be their first Christmas together as a "family."

The victim and Mr. Loria maintained both emotional and physical intimacy long after the period of time in which the victim had claimed the relationship ended. The criminal complaint refers to a "dinner incident" in February 2017, almost 8 months after the victim had claimed the relationship had ended; the incident is portrayed as if Mr. Loria had shown up without notice, threatened the victim's ex-boyfriend, and left the incident holding a grudge against her. *See Complaint*, Dkt. # 1 at 5. It was alleged that "following the dinner incident, the Victim began receiving escalating threats via phone call, text message, or in person at her place of business… The Victim subsequently warned her employees not to let Loria on the property." *Id.*
That is completely inconsistent with the truth, as supported by text messages from the time. She was not upset with Mr. Loria, and, in fact, she invited Mr. Loria to her property almost immediately after the "dinner incident." He was invited over on February 13th in a series of intimate test messages, and he was invited over on the 14th, Valentine's Day. She continued to see him and invite him over in March and April. On multiple dates in April, he watched her property overnight for her. This is established in the text messages as well.

The evidence of text messages established a much different history than that which the victim had conveyed to the Government. Reading the Complaint would lead one to believe that this relationship was a short, months-long fling, followed by stalking and threatening behavior. The evidence shows a relationship far different from the one described in the complaint.

Of course, to the extent the victim misled the Government regarding certain aspects of the relationship and provided false information in some specific instances, that does not absolve Mr. Loria of guilt, and these factual clarifications are certainly not intended to attack or blame

the victim for any of Mr. Loria's conduct. It is, however, necessary to note the discrepancies, because the complaint paints a much more different narrative than that which is reflected in Mr. Loria's factual basis and the cellular extraction evidence.

Since the nature and circumstances of the offense must be considered by the Court, it is our responsibility to note discrepancies in the narrative, especially those contained in the complaint and/or relied on in the PSR. It is acknowledged that the offense is nonetheless a serious one, but the impact of a 24-month sentence, followed by supervised release will provide for a sufficient sentence to adequately address these facts.

## Purpose of Sentencing

The court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of 18 U.S.C. § 3553 (a). Paragraph 2 states that the Court shall consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553

.

Seriousness of the offense, respect for the law, and just punishment

As described above, the 24-month term of incarceration, the separation from his dog, Blue, the Order of Restitution, and the term of supervised release will provide for a sentence that reflects the seriousness of the offense and just punishment for Mr. Loria's conduct. The Government noted that "the victim in this case is fully supportive of this resolution." Dkt. # 32 at 2. Upon information and belief, the victim had actually expressed agreement with a sentence of 18-months, a period of time that had been discussed earlier in negotiations, but was ultimately not approved by supervisors in the US Attorney's Office.

Adequate deterrence to criminal conduct

The charged offense carried no mandatory minimum and a maximum sentence of five years. The plea agreement calls for a multi-year sentence before release to Supervised Release. To the extent the sentencing has any impact on public deterrence, this sentence would be sufficiently long enough to satisfy that factor.

Protection of the public from further crimes of the defendant

First and foremost, the renewed commitment to mental health and medication should alleviate concerns over the defendant's previous behavior. His age may also be a factor.

The defendant's "most recent [criminal conviction] was over 20 years ago for a violation-level offense." Dkt. # 35 at 4. At that time, he was in his early 30s. He is now over 50-years-old, and if the Court accept the terms of the plea agreement, he will serve a 24-month sentence followed by a term of supervised release. Statistically, the risk of recidivism at this point in his life is dramatically lower when considering that the United States Sentencing Commission has

reported that "older offenders are substantially less likely to recidivate following release compared to younger cohorts... The pattern is consistent across age groups[;] as age increases[,] recidivism by any measure declined. Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average. ("The Effects of Aging on Recidivism Among Federal Offenders,"

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf at 30)

The relatively recent findings from the 2017 report are historically consistent with prior studies that analyzed age and recidivism. In 2005 the Commission noted "Studies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings." ("Recidivism Among Federal Offenders: A Comprehensive Overview," https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf at 23)

Mr. Loria presents a low risk of recidivism, and furthermore, he will be on supervision at the time of his release. That will ensure oversight and support for many aspects of his life including his ongoing treatment. Mr. Loria will not present any danger to the public upon his release.

Needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Mr. Loria intends to seek medical care for his mental health whether incarcerated or released. The 24-month sentence would be more than sufficient to satisfy this factor.

<u>CONCLUSION</u>

Theodore Loria has accepted responsibility and is prepared for sentencing. It is hoped that the Court will impose a sentence, consistent with the plea agreement, and Mr. Loria may serve his time, and subsequently focus on treatment and, if possible, return to work.

Dated: October 7, 2020

Respectfully submitted,

s/Mark A. Foti
Mark A. Foti, Esq.
Attorney for Defendant, Theodore Loria
The Foti Law Firm, P.C.
16 West Main Street, Suite 100
Rochester, New York 14614
Phone: (585) 461-1999
E-mail: mark@fotilaw.com
